[File No. 6315.]

E. B. LARSON, Respondent, v. MR. & MRS. ANTON RUSTAD.

ANTON RUSTAD, Appellant.

(264 N. W. 526.)

Opinion filed October 18, 1935. Rehearing denied January 27, 1936.

*Kaldor & Kaldor,* for appellant.

*Burdick & Burdick,* for respondent.

CHRISTIANSON, J. Plaintiff brought this action to recover damages for the alleged destruction of sheep by a dog belonging to the defendant. The case was tried to a jury and resulted in a verdict in favor of the plaintiff. The defendant moved for a new trial on the grounds: (1) Insufficiency of the evidence to justify the verdict; and (2) newly discovered evidence material to the defendant which he could not with

reasonable diligence have discovered and produced at the trial. The motion was denied and defendant has appealed from the judgment and from the order denying a new trial.

No errors are assigned upon rulings relating to evidence or upon instructions given or refused.

The only errors assigned and presented for determination on this appeal are: (1) Is the evidence sufficient to sustain the verdict? (2) Should the trial court have ordered a new trial on the ground of newly discovered evidence?

Appellant contends that the evidence is insufficient to sustain the verdict because: (1) "The evidence conclusively shows that the dog did not belong to the defendant Anton Rustad." (2) "The evidence conclusively shows that the dog could not have killed plaintiff's sheep, as this dog was locked up in the barn during the entire time the sheep were killed."

In this state the owner of any dog is made "liable in a civil action for all damages that may accrue to any person by reason of such dog killing, wounding, or chasing any sheep or any domestic animal." Laws 1927, chapter 252.

This action was instituted against Anton Rustad and his wife. In the complaint it is alleged that the plaintiff was the owner of certain sheep kept on his farm in Traill county; that "the defendants were owners of a certain German police dog, and on . . . the 14th day of April, 1931, the defendants negligently and carelessly allowed and permitted said dog to run at large; . . . that the said dog . . . came upon the farm of the plaintiff . . . and attacked, bit and killed all of the sheep set forth herein."

The defendants interposed an answer which, aside from a general denial, contained the following admissions: "(1) Defendants admit they owned a dog on or about the 14th day of June, 1931, but in that connection, state that the said dog was not a pure-bred German police dog. (2) Defendants also admit that they have refused to pay the damages claimed by the plaintiff in this action."

After the answer had been made, and before the trial of the action, defendant's wife died; and upon the trial the plaintiff moved that the action be dismissed as against her. Upon the trial the defendant asked

for leave to serve and file an amended answer. The motion was granted and the defendant, Anton Rustad, served and filed an answer omitting the first of the above quoted allegations, viz.: the admission that defendants were the owners of a dog.

The evidence adduced at the trial disclosed that shortly after six o'clock on the morning of June 14, 1931, the plaintiff Larson, became aware that a number of his sheep had been killed or injured. In walking through the pasture looking at the damage that had been wrought he observed a dog, a so-called German Police dog, snapping or biting at a lamb that was then badly injured. The plaintiff determined to capture the dog. Plaintiff testified:

"When I seen the dog, I didn't have no gun. If I'd had the gun, I'd have shot him. But I got down and crawled up on top of the bank, because where the dog was laying, there was a plum tree broke down and laid over on the bank, and it was kind of shut in there, and the dog was back under there. And I got up on the bank and crawled down, and when I was about ten feet away, I made one dive for the dog, and I got him, and we both went in the river. And I tried to drown him in the river, but I couldn't get him off of his hind legs. . . . He had a strap around his neck, and I twisted that till his tongue hung out. We got out on the bank, and I took my suspenders and put that in the strap, and led him home."

The plaintiff further testified that he tied the dog in a building used as a toolhouse, and thereafter notified the sheriff and the state's attorney of the county. Later they both came to plaintiff's farm, arriving there about eight-thirty that same morning. The sheriff telephoned the defendant, Anton Rustad, and requested that he come over to plaintiff's place. Rustad arrived there about nine o'clock that morning. According to the testimony of the sheriff and the plaintiff the defendant Rustad, after looking at the dog, said it was his dog. Later he asked the sheriff to shoot the dog. The sheriff complied with his request. There was also further evidence that the dog had been assessed as the property of the defendant Rustad. The defendant, however, testified that the dog did not belong to him, but belonged to his wife.

The defendant Rustad testified that his hired men were ordered to keep the dog in the barn during the night; that the dog was his wife's

pet; that she did not want him to be out at night or to leave the farm; that on the morning of June 14th the dog was let out of the barn about fifteen minutes after seven o'clock; that his wife then called the dog to the house and fed him. He further testified that the dog was playful and only about eleven months old; that the dog "never was away from the farm for half an hour" and that "the dog was never away many minutes" before defendant would go after it. One Tronnes testified that he worked on the defendant's farm in June, 1931; that the dog in question never showed signs of being vicious; that he never saw him attack any animals; that Rustad had ordered that the dog should be kept in the barn at night; that on the morning of June 14th, between seven and seven-thirty o'clock, when he went to the barn to milk the cows the dog was still there and that the dog was then let out of the barn.

The plaintiff testified that on the morning of June 14th he arose and went out in the barnyard "a little after six o'clock in the morning;" that he observed a number of sheep standing along the fence near the barn, "all bloody around the neck;" that he immediately went into the pasture, and down to the river bank where he found a number of sheep in the river,—many of them killed and the remainder seriously injured; that at that time he did not notice any dogs; but that about three quarters of an hour later he found the dog in question in the east end of the pasture biting or snapping at an injured lamb. Plaintiff testified that the dog "was all bloody;" that he saw wool "around the side of his mouth;" that "there was blood around his mouth and on his side."

The sheriff, Osman, testified that he was called by the state's attorney a few minutes before eight o'clock on the morning of June 14th and that he and the state's attorney proceeded to the Larson farm and arrived there about 8 : 30. As regards what occurred after they arrived at plaintiff's farm, the sheriff testified as follows:

"We came out to the farm, and we met Mr. Larson out in the yard there, and he took us down to the auto-shed, and showed us the dog. Then he took us out in the yard, and showed us the injured sheep. . . . We were down in the coulee and looked over those down in the river. Then we went up and looked over those in a pile right close

to the shed there; and I says to the state's attorney, I says: I think it would be a good idea to have Mr. Rustad come out here. So I went up to the house, and called Rustad, and he came in a short while. . . . We went down and looked at the dog, and Rustad said that was his dog all right. Then we took him along, and went out and showed these injured sheep. And we talked over the situation, and Rustad was very fair about it. He says: if the dog has done this, he said, we'll certainly do away with him. And I had the State's Attorney take a piece of paper and mark on the number of injured sheep, and I was doing the counting, and he was doing the marking down. So after a little Rustad says: Sheriff, you go ahead and shoot that dog. So I ordered Larson there to take the dog and tie him to a post, and I got my gun and shot him."

As regards the condition of the sheep the sheriff testified:

"There was, in a big pile, they had been gathered together, they were laying close together, a pile there of 18 sheep, some of them dead, and some of them that was not dead. . . . Then there was six that was out in the river, or in the coulee, what they call it there. . . . They were dead."

We are of the opinion that when the evidence in this case is considered as a whole it cannot be said that the evidence is insufficient to sustain the verdict in any particular. In short, the evidence here is not such that reasonable men could draw only the one conclusion: (1) That the dog did not belong to the defendant; or (2) that the dog did not kill or injure the sheep.

Appellant's argument seems to be predicated upon the assumption that the testimony of the defendant and his witness Tronnes to the effect that the dog was put in the barn on the evening of June 13th and kept there until seven-fifteen or seven-thirty on the morning of June 14th must be accepted as true in all particulars. This assumption is not warranted in light of the testimony and the circumstances in the case. It was for the jury to determine to what extent the testimony of Rustad and Tronnes was true. It was for them to say whether in light of what transpired on the morning of June 14th, what the defendant Rustad said or did not say after he reached plaintiff's farm on that day, and all the other facts and circumstances disclosed by the evidence, the

testimony of Rustad and Tronnes was true or untrue. According to the testimony of Rustad and Tronnes the dog was not let out of the barn on the morning of June 14th before seven-fifteen. After being let out he came to the house where he was fed by Mrs. Rustad. Yet about seven o'clock or in any event before eight o'clock, the dog is found on the plaintiff's farm, a mile or more away, worrying a lamb that had been bitten by a dog. According to the testimony of the sheriff he was called before eight o'clock and the state's attorney had been called by the plaintiff Larson some time before that. The defendant Rustad, according to his own testimony, was called by the sheriff and came to plaintiff's farm about nine o'clock that morning. In other words, according to the defendant Rustad's testimony, he was not only called but reached plaintiff's farm only about an hour and three quarters or an hour and a half after the dog had been fed at defendant's farm. Defendant must have known that it took some time for the sheriff and state's attorney to be called and reach the place. If the dog had been at defendant's farm until after seven-fifteen that morning nothing would have been more natural than that the defendant would have disclosed this fact to the sheriff and to the plaintiff and insisted that his dog could not have wrought the damage. But there is no claim that the defendant at that time made any remonstrance or any claim that his dog could not have wrought the damage or that he then claimed or asserted that the dog had only been let out of the barn a relatively short time before he (defendant) was called and notified of the damage. In view of the large number of sheep that had been killed or injured which the defendant himself saw, it is passing strange that he did not at that time remonstrate with the plaintiff and the sheriff that it was wholly unlikely that his dog could have wrought the damage.

In the circumstances thus disclosed we think, as said, it was for the jury to determine what the truth was, and that the jury was not bound to believe the testimony of the defendant Rustad or the testimony of his witness, Tronnes, that the dog had been confined in the barn from the evening of June 13th until after seven o'clock on the morning of June 14th. In short, we are of the opinion that the evidence in the case presented questions of fact for the consideration of the jury. That, also, seems to have been the belief of the counsel for the defendant at

the time of the trial because there was no motion for a dismissal and no motion for a directed verdict in favor of the defendant. It was also the opinion of the trial judge. In denying the motion for a new trial the trial judge prepared and filed a rather extended memorandum decision wherein he reviewed the evidence in the case at some length. As regards the evidence relating to ownership of the dog the trial judge said: "On the evidence ownership of the dog was clearly a question of fact for the jury." As regards the evidence relating to whether the dog killed and injured the sheep, the court said: "I am of the opinion that the evidence is amply sufficient to sustain the verdict."

Did the court err in denying a new trial on the ground of newly discovered evidence? We think not. The application for a new trial on the ground of newly discovered evidence is supported by three affidavits: The affidavits of Albert Braaten, the defendant Anton Rustad, and his attorney, Kaldor.

The affidavit of Braaten is to the effect that he worked for the defendants, Mr. and Mrs. Anton Rustad, during the month of June, 1931, and that he recollects that on the morning of June 14, 1931, the defendant's dog was in the barn until after seven-fifteen in the morning; also that he knows that the dog was kept in the barn between the evening of June 13th and the morning of June 14th.

The affidavits of the defendant Anton Rustad and his attorney, Kaldor, are to the effect that one Walter Hage, a brother-in-law of the plaintiff, Larson, had informed the defendant Rustad and his attorney that he (Hage) knew that the plaintiff, on June 14th, did not have forty sheep but only twenty-eight; that the plaintiff Larson had told Hage that he had traced the dog that had killed his sheep on June 14th to the farm of one John Fortman but that he had told Fortman to keep quiet and say nothing about it as he had Rustad's dog tied up and would go after him (Rustad) for the damages as Fortman had no money; also that the plaintiff, Larson, upon a subsequent occasion, told said Hage that four of the sheep which he claimed were killed by defendant's dog were not killed on June 14th but were killed later by other dogs. There is attached to the affidavits of the defendant Rustad and his attorney a proposed affidavit prepared for the signature of Walter Hage; but it is stated that Hage, when asked to sign the af-

fidavit, stated "that the plaintiff, E. B. Larson, was his brother-in-law and therefore he did not care to sign said affidavit as it would look as though he had volunteered the information against his own brother-in-law," but that said Walter Hage further stated that if he were subpœnaed and compelled to testify as a witness he would testify to the facts substantially as set out in the proposed affidavit.

As said, the trial court, in denying the motion for a new trial, prepared a memorandum decision and in that decision gave careful consideration to the proposed new evidence. The court said:

"With regard to the second point, it is contended that a new trial should be granted because of newly discovered evidence.

"I realize that the granting of an application for a new trial, on the ground of newly discovered evidence, rests in the sound legal discretion of the court. But new trials should not be granted just because the court may feel it plays safe in doing so. If people's rights have been violated, and they seek redress through the channels provided by the law, and compensation is granted, the court should not disturb such finding on a basis of whim or fancy or notion. The court should, and must, use its sound legal discretion. If the newly discovered evidence would lead the court to believe that there was a miscarriage of justice in the trial had, then the court should exercise that sound legal discretion in favor of granting a new trial. But where the evidence is mostly cumulative, and a great deal of it, as shown by the affidavits attached to the showing for a new trial, is hearsay, then the court, in my opinion, would be abusing its sound legal discretion to grant a new trial.

"In this connection, it may be mentioned that there is nothing in the affidavits showing that the defendant, by the exercise of reasonable diligence, could not have discovered the testimony, or secured the same by deposition or otherwise, before the trial, except as to Albert Braaten; and as to him, his evidence is merely cumulative. Both Mr. Rustad and one of the men that claimed he locked the dog in the barn at night and let him out in the morning, testified upon the subject that Mr. Braaten relates in his affidavit. All the other parties mentioned in the affidavits reside in the immediate neighborhood where the sheep were killed. . . .

"Of course, there are instances where newly discovered evidence,

though cumulative, is so decisive of a different result that a new trial should be granted. But such is not the case on the showing made here. On the matter of letting out the dog in the morning, there was positive evidence, and the evidence of Albert Braaten would simply be one more witness. The statements made by Anton Rustad, in his affidavit, are all hearsay. So are the statements made by Mr. Kaldor. . The statement made by Walter Hage is not signed or acknowledged. That is attached as Exhibit A. On the testimony of Albert Braaten alone, being merely cumulative, since it was fully covered at the trial, the court should not grant a new trial. Northern Trust Co. v. Bruegger, 35 N. D. 150, 159 N. W. 859, Ann. Cas. 1917E, 447; Ruble v. Jacobson, 51 N. D. 671, 200 N. W. 688."

The motion for a new trial involved here was addressed to the discretion of the trial court. Pengilly v. J. I. Case Threshing Mach. Co. 11 N. D. 249, 91 N. W. 63; Malmstad v. McHenry Teleph. Co. 29 N. D. 21, 149 N. W. 690; Aylmer v. Adams, 30 N. D. 514, 153 N. W. 419; State v. Cray, 31 N. D. 67, 153 N. W. 425; McGregor v. Great Northern R. Co. 31 N. D. 471, 154 N. W. 261, Ann. Cas. 1917E, 141.

In considering a motion for a new trial on the grounds of insufficiency of the evidence to justify the verdict and newly discovered evidence in Pengilly v. J. I. Case Threshing Mach. Co. 11 N. D. 249, 91 N. W. 63, supra, this court said:

"When motions of this nature are presented· to a court, they are classified as motions addressed to the discretion of the court. In considering the evidence adduced or that newly discovered, no fixed rules of law exist which could be decisive of the result of the investigation. Under such circumstances a margin of discretion is vested in trial courts, which permits them, with a view to promoting the ends of justice, to weigh the evidence, and, within certain limitations, act upon their own judgment with reference to its weight and credibility. Nor, in such cases will the court necessarily be governed by the fact that the verdict returned has the support of an apparent preponderance of the evidence. Unrighteous verdicts sometimes are supported by apparently substantial evidence, and to meet such exceptional cases the presiding judge, who sees and hears the witnesses, is vested with a

discretion to vacate such verdicts and order a new trial in furtherance of justice. The rule that governs a court of review in this class of motions—i. e., those which appeal to judicial discussion—does not apply to trial courts, and hence the trial court is not debarred from granting or refusing a new trial by the mere fact that the verdict rests upon substantial or conflicting evidence. Hayne, New Trials, Sec. 97. This discretion, however, is neither capricious, arbitrary, nor unrestricted. It is, on the contrary, a reasonable discretion, to be exercised with great caution, and in cases of abuse the trial court will be reversed by the reviewing court in this class of cases. The duties devolving upon a court of review in this class of cases are to be distinguished from those which govern in trial courts. In the reviewing tribunal the weight and credibility of testimony will only be considered with a view to determine whether the order made in an inferior court, when acting within the domain of discretion, was or was not an abuse of discretion." Pengilly v. J. I. Case Threshing Mach. Co. 11 N. D. 255, 91 N. W. 63.

In this case the trial court, after deliberate and careful consideration, determined that the ends of justice would be best subserved by denying defendant's motion for a new trial. The record presented to this court on this appeal discloses no reason for disturbing the decision of the trial court. Accordingly, the judgment and order appealed from must be and they are affirmed.

BURKE, Ch. J., and NUESSLE and BURR, JJ., concur.

MORRIS, J., did not participate.